**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

DAVID B. AMATO, #367-665

                 Plaintiff,          :

                 v.                :   CIVIL ACTION NO. RWT-13-999

DORCHESTER COUNTY DETENTION  :
CENTER,
SERGEANT NELLIE HARRIS,[1]     :
CAPTAIN MILLS,
LT. MILES,                   :
DON B. SATTERFIELD, WARDEN,

               Defendants.      :

## MEMORANDUM OPINION

Self-represented Plaintiff David B. Amato,[2] a Maryland Division of Correction (hereinafter, "DOC") prisoner presently incarcerated at Maryland Correctional Institution-Hagerstown, filed the above-captioned civil rights action seeking money damages[3] and alleging that Defendants unlawfully placed him in restraints while he was held at the Dorchester County Detention Center ("Detention Center"). Plaintiff alleges that he was subjected over a period of several days to placement in a "4-point Humane Restraint Device" and "the chair," even though he "posed no physical threat" to staff and merely sought his "psych medication." ECF No. 1.

The case is before the court for resolution of a dispositive motion filed by Defendants (ECF No. 8); Plaintiff's opposition thereto (ECF No. 11); Defendants' reply (ECF No. 12); and

---

[1] The Clerk shall amend the docket to reflect the full spelling of this Defendant's name, and shall also correct the spelling of the Warden's surname.

[2] Mindful that Plaintiff is proceeding pro se, this court must liberally construe his pleadings. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (pleadings filed by pro se litigant held "to less stringent standards than formal pleadings drafted by lawyers").

[3] As previously stated, the court will not consider Plaintiff's request for reduction of sentence in conjunction with this civil rights action. ECF No. 3, n. 1. Similarly, his claim that he was denied access to legal materials, expressly stated as a ground for relief for the first time in his surreply, ECF No. 13, will not be examined here.

Plaintiff's surreply (ECF No. 13).  Pursuant to Local Rule 105.6 (D. Md. 2011), no hearing is needed to resolve Plaintiff's claims.

## Preliminary Matter

The crux of the Complaint is Plaintiff's allegation that he was improperly subjected to physical restraint on several occasions during mental health crises.[4]  Once a party's competency has been brought to the court's attention, it is required to consider and decide the issue. *See Seibels, Bruce & Co. v. Nicke*, 168 F.R.D. 542, 543 (M.D.N.C. 1996). While Federal Rule of Civil Procedure 17(c)(2) allows the court to appoint a guardian ad litem, it does not compel it to do so, but rather grants it considerable discretion to issue an "appropriate order" to protect the interest of an unrepresented incompetent litigant.

Plaintiff is no stranger to Maryland's criminal courts.[5]  At the time at issue here, he was held at the Detention Center awaiting trial on charges of first and second-degree assault, reckless endangerment, false imprisonment and concealing a dangerous weapon.[6]  He pleaded guilty to first-degree assault and was sentenced to twenty-five years' incarceration, all but twelve years and six months suspended, and five years' probation.  ECF No. 8-6 at 1-5.  Although the

---

[4] Plaintiff does not name Con Med Health Care Management, the contractual health care provider, for its role in providing medical and mental health care during his confinement at the Detention Center. In his surreply, ECF No. 13 at 3-4,  for the first time, he "state[s] that my suit encompasses both the Detention Center, and Conmed, as Conmed is ultimately under the eye of the jail staff…[and thus] is responsible for the actions of Conmed as well…" It appears that Plaintiff seeks to pursue at the eleventh hour a claim against Con Med, presumably under the theory of vicarious liability known as respondeat superior which does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983); *Nedd v. Correctional Medical Services*, Civil Action No. JFM-92-1524 (D. Md., October 22, 1992), citing *Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982); *McIlwain v. Prince William Hospital*, 774 F.Supp. 986, 990 (E.D.Va. 1991).  Plaintiff's lawsuit is directed solely against Detention Center personnel allegedly responsible for placing him in restraints.  As such, the undersigned takes no position as to the likelihood of success should Plaintiff elect to pursue a cause of action against Con Med or its personnel.

[5] *See* http://casesearch.courts.state.md.us/inquiry/inquirySearch.jis.

[6] *See* http://casesearch.courts.state.md.us/inquiry/inquiryDetail.jis?caseId=09K10014012&loc=46&detailLoc=K.

sentencing court recommended placement at Patuxent Institution,[7] such recommendation does not amount to a finding of incompetence or mental defect. Given Plaintiff's apparent ability to fully articulate his case, there is no requirement under Rule 17(c)(2) for appointment of a guardian to pursue the claim presented.

## Standard of Review

### 1. Motion to Dismiss

Defendants have moved to dismiss or, in the alternative, for summary judgment. "'The purpose of a Rule 12(b)(6) motion [to dismiss] is to test the sufficiency of a complaint.'" *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010) (citation omitted). A Rule 12(b)(6) motion constitutes an assertion by the defendant that, even if the facts that plaintiff alleges are true, the complaint fails, as a matter of law, "to state a claim upon which relief can be granted." Fed R. Civ. P. 12(b)(6). Therefore, in considering a motion to dismiss under Rule 12(b)(6), a court must "'accept[ ] as true the well-pled facts in the complaint and view[ ] them in the light most favorable to the plaintiff.'" *Brockington v. Boykins*, 637 F.3d 503, 505 (4th Cir. 2011) (citation omitted).

Plaintiff's claim against the Detention Center cannot proceed under 42 U.S.C. § 1983 because it is not a "person" within the meaning of the Civil Rights Act. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 65 (1989); *see also Powell v. Cook County, Jail*, 814 F. Supp. 757 (N.D. Ill. 1993); *Marsden v. Fed. Bureau of Prisons*, 856 F. Supp. 832, 836 (S.D.N.Y. 1994)

---

[7] Patuxent, a specialized institution, is the only dedicated treatment facility within Maryland's Department of Public Safety and Correctional Services ("DPSCS"). As noted on Patuxent's website, "[The] facility provides treatment to men, women and youth in its Eligible Person (EP) program through the use of remediation management that combines psychiatry, psychology, social work and custody on each team." *See* http://www.dpscs.state.md.us/agencies/patuxent.shtml. It appears that Plaintiff was not admitted to the Patuxent program.

("jail not an entity amenable to suit"). It is therefore subject to dismissal pursuant to Fed R. Civ. P. 12(b)(6).

Defendants Mills and Miles are named in the caption of the Complaint, yet no alleged misconduct is attributed to them. Indeed, their names do not appear anywhere in the plethora of pleadings and exhibits filed in this case. Dismissal of these Defendants under Rule 12(b)(6) likewise is appropriate.

### 2. Motion for Summary Judgment

Ordinarily, a court cannot consider matters outside the pleadings or resolve factual disputes when ruling on a Rule 12(b)(6) motion. *See Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). If the court does consider matters outside the pleadings, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *see also Finley Lines Joint Protective Bd. Unit 200 v. Norfolk S. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials.").

This court deems it appropriate to consider the extraneous materials, as they are likely to facilitate disposition of this case with regard to the remaining Defendants, Sergeant Nellie Harris and former Warden Don B. Satterfield.[8] Accordingly, the motion with regard to these Defendants shall be treated as a motion for summary judgment.

---

[8] A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5C Wright & Miller, Federal Practice & Procedure § 1366, at 159 (3d Ed. 2004). But, this discretion "should be exercised with great caution and attention to the parties'

Rule 56(a) of the Federal Rules of Civil Procedure provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). At the same time, the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)) (internal quotation marks omitted) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). This case shall be analyzed in light of this standard of review.

---

procedural rights." *Id*. at 149. In general, courts are guided in this determination by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.* at 165–67. For reasons apparent herein, discovery is not required to resolve this case.

## Background

At the time of the incident, Plaintiff was a pretrial detainee. This distinction is not material, however, because the constitutional protections afforded a pretrial detainee as provided by the Fourteenth Amendment are co-extensive with those provided to convicted prisoners by the Eighth Amendment. *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979); *Hill v. Nicodemus*, 979 F.2d 987, 991 (4th Cir. 1992), citing *Martin v. Gentile*, 849 F. 2d 863, 870 (4th Cir. 1988); *see also Riley v. Dorton*, 115 F. 3d 1159, 1167 (4th Cir. 1997) (pretrial detainee's Fourteenth Amendment right with respect to excessive force is similar to prisoner's Eighth Amendment right). As a practical matter, the Fourth Circuit does not distinguish between the Eighth and Fourteenth Amendments in the context of a pretrial detainee's civil rights claim, *see Hill v. Nicodemus,* 979 F.2d 987, 990-92 (4th Cir. 1992).

The inquiry with respect to Plaintiff's restraint is whether subjecting Plaintiff to such restraint amounted to punishment, as due process proscribes punishment of a detainee before proper adjudication of guilt. *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979). Plaintiff's claim that the use of restraint was improper most closely resembles a claim of excessive use of force of a pretrial detainee which also is governed by the Due Process Clause of the Fourteenth Amendment. *See Orem v. Rephann,* 523 F.3d 442, 446 (4th Cir. 2008) (quoting *Young v. Prince George's County, Maryland,* 355 F.3d 751, 758 (4th Cir. 2004)).

In order to prevail on his claim that Defendants improperly subjected him to restraint, Plaintiff must establish that Defendants "inflicted unnecessary and wanton pain and suffering." *Whitley v. Albers*, 475 U.S. 312, 320 (1986). In examining the facts, the court must determine whether the restraint "'was applied in a good faith effort to maintain or restore displine or maliciously and sadistically for the very purpose of causing harm.'" *Whitley,* 475 U.S. at 320

(quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d. Cir. 1973)). In determining whether "the constitutional line has been crossed," the court must look at the need for application of force; the relationship between that need and the amount of force applied and the extent of the injury inflicted. *Orem*, 523 F.3d at 446, quoting *Johnson,* 481 F.2d at 1033. In short, force becomes constitutionally excessive when it amounts to punishment. *See United States v. Cobb*, 905 F.2d 784, 788 (4th Cir. 1990). The facts of the case – which are largely uncontroverted -- shall be examined in this context.

The parties do not dispute that Plaintiff was committed to the custody of the Dorchester County Department of Correction on July 23, 2010, as a pretrial detainee and housed at the Detention Center until his transfer to the DOC on February 25, 2011, following his conviction and sentencing. ECF No. 8-6 at 1-5, 22. Plaintiff's initial medical assessment at the Detention Center revealed normal findings, including "[n]o unusual anxiety, evidence of depression, or psychosis." ECF No. 8-17 at 2. On August 10, 2010, however, he submitted an Inmate Request Form in which he admitted that he had a "psych history," indicating prior mental health treatment during previous incarcerations in the Harford and Cecil County Detention Centers and a diagnosis of Bipolar Disorder in 2001 by staff at the Harford Memorial Hospital. *Id.* at 6-8, 30. As a result, Detention Center personnel obtained Plaintiff's executed medical release and requested Plaintiff's medical records to confirm his diagnosis. *Id.* at 14-21.

Plaintiff also admitted at a medical screening on August 16, 2010, to an extensive history of substance abuse and criminal violence, much of which involved police. ECF No. 8-17 at 8-9. He also admitted to having used psychiatric medications, specifically mood stabilizers, including Depakote,[9] Seroquel,[10] and Zyprexa,[11] none of which "worked." *Id.* at 8-9. He gave a family

---

[9] Depakote is an antiepileptic medication also used to treat acute manic symptoms in those with Bipolar Disorder. *See* https://www.depakote.com/about-depakote.

history involving both depression and alcohol abuse and denied suicidal thoughts. *Id.* at 6-9. On August 25, 2010, he was diagnosed as poly-substance dependent, and as having mood disorder and anti-social personality disorder. ECF No. 8-4 at 5-7.

During the seven months spent at the Detention Center, Plaintiff had several encounters with Detention Center personnel that led to restraint. He does not refute Defendants' description of his behavior leading to these encounters, but rather claims that the use of restraint would not have been required had he been provided appropriate psychotropic medication.

On August 25, 2010, Plaintiff was scheduled to move from his cell to a cell in the R-3 Area Max A. ECF No. 8-9 at 2-5; ECF No. 8-15 at 1-2. As he was scheduled to see the doctor that day, he was taken to the Mental Health Room to speak to the doctor prior to the move. ECF No. 8-9 at 2-5; ECF No. 8-15 at 1-2. As officers packed his belongings, they found two pieces of twisted wire with sharp points on Plaintiff's bunk. ECF No. 8-9 at 2-5; ECF No. 815 at 1-2.

A short time later, Corrections Officer Shannon Stinton confirmed that Plaintiff had finished his medical visit and told Plaintiff that he was going to be taken to his new cell. ECF No. 8-9 at 2-5. Plaintiff refused to move and when ordered to do so, told Stinton "Fuck you, Officer Stinton, I'm not done." ECF No. 8-9 at 2-5; ECF No. 8-15 at 1-2. The doctor intervened and told Plaintiff that she was done, at which point Plaintiff said to the doctor, "Fuck you" and walked out, escorted by officers, including Darrence Slacum. *Id.*

As he was being placed in his cell, Plaintiff told Slacum that he was going to kill himself. *Id.* Slacum immediately called Sergeant Harold Moore, who asked Plaintiff if he were okay. Plaintiff said, "No, nigger, you heard me…I'm [going to] kill myself." Moore called for

<hr/>

[10] Seroquel is an anti-depressant also used to treat depressive, manic or mixed episodes of those affected by Bipolar Disorder. *See* http://www.seroquelxr.com/.

[11] Zyprexa ("olanzapine") is used to treat schizophrenia as well as manic or mixed episodes of those affected by Bipolar Disorder. It often is used in conjunction with lithium. *See* http://www.rxlist.com/zyprexa-drug/indications-dosage.htm.

additional officers and then ordered Plaintiff to fall to his knees and face the wall with his hands behind his back. When Plaintiff complied, Slacum placed handcuffs and escorted Plaintiff to Cell R-1 in the Detoxification Unit. Plaintiff was uninjured during the incident. *Id.*

Plaintiff was placed under suicide precautions on August 25, 2010, and prescribed Ativan,[12] Benadryl,[13] and Haldol[14] to relieve his agitation and anxiety. ECF No. 8-17 at 35, 41. Plaintiff continued to be loud and obnoxious. ECF No. 8-17 at 41. He made several statements concerning the girlfriend he had assaulted, stating "the bitch deserved it and I am going to kill her when I get out!" ECF No. 8-9 at 2-5; ECF No. 8-15 at 1-2; ECF No. 8-17 at 41.

The next day, August 26, 2010, Plaintiff began shouting that he wanted his "psych med" and that he needed it to sleep. ECF No. 8-9 at 6-13; ECF No. 8-15 at 3-4. When Medic Wendy Jones told him there were no orders that he be given medication, Plaintiff began to hit and kick the cell door. He continued to do so after being ordered to stop, began to punch the cell walls, made inappropriate gestures towards the officers, and said he would continue until he received medication. When ordered by Sergeant Fitzgerald to stay away from the cell door, he shouted, "Fuck the door and fuck you too!" *Id.*

At approximately 7:00 p.m., Plaintiff was placed in leg irons and handcuffs, and then placed in the Portable Detention Unit ("PDU") or "chair."[15] As he was being placed in the PDU, Plaintiff said the officers were "helping his case" and that he would "see them in court." He also demanded "some pills" that he was supposed to get "for being mental." *Id.* As the restraint straps were secured, Plaintiff shouted that he was going to contact the newspaper, the news

---

[12] Ativan is used to treat anxiety disorders. *See* http://www.drugs.com/ativan.html.
[13] Benadryl is an antihistamine. *See* http://en.wikipedia.org/wiki/Benadryl.
[14] Haldol is an anti-psychotic medication. *See* http://www.rxlist.com/haldol-drug.htm.
[15] The PRO-STRAINT chair is a restraining device used to control those who present such danger to themselves or others that they cannot be maintained in a regular cell. A description of the PDU and Detention Center policies regarding its use are set forth in the Affidavit of current Warden Steven M. Mills. ECF No. 8-4 at 1-2.

station and his attorney because of his "mistreatment" and the "denial" of his medication. The straps were examined by a medic per standard practice and the PDU was placed in the inmates' gym. When asked if he were still going to kill himself, Plaintiff said, "yes." *Id.* He indicated he would keep repeating this statement until he received the medication he was demanding. The PDU was secured to the floor and the officers left. ECF No. 8-9 at 6-13.

Plaintiff was under observation by the medical staff during the period of restraint, which continued until August 30, 2010. ECF No. 8-14 at 1-32; ECF No. 8-17 at 63-102. During this time, he claims then-Warden Satterfield allegedly visited him, told him he'd remain in restraints another 24-hours, and "laughed" at him. ECF No. 13 at 7-8. When seen by medical staff on August 30, Plaintiff "apologized to female case manager for his behavior" and said he "understands why he was placed on precautions." He further admitted that he didn't want to be around people and "did things on purpose to get into solitary." He was cleared from restraint and suicidal level observation and told to follow up with medical staff in two or three weeks. ECF No. 8-17 at 41, 56. On September 1, 2010, he was prescribed Lithium,[16] Effexor,[17] and Extra Strength Tylenol. ECF No. 8-15 at 56.

Plaintiff was involved in two additional disturbances on September 2, 2010. At approximately 7:25 a.m., Corporal Tim Thomas responded to a reported disturbance caused by Plaintiff kicking his cell door. Thomas asked Amato what the problem was and Amato responded that he was trying to get someone's attention due to his back pain. Plaintiff complied with Thomas's order to sit down on his bunk. Thomas told Plaintiff not to bang on the door again and that, if he needed assistance, to make the request of an officer when he passed by.

---

[16] Lithium is used to treat and prevent episodes of mania in those with Bipolar Disorder. *See* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681039.html#why.
[17] Effexor is used to fight depression, anxiety, and panic disorder. *See* https://www.effexorxr.com/about-effexor-xr.aspx.

Plaintiff complained that he had not been checked all night, and Thomas disagreed, indicating he had been by the cell several times doing checks and that each time, Plaintiff was asleep with the blankets pulled over his head. Plaintiff stated that he had tried to speak to a medical technician about the pain but she had walked away laughing, prompting him to kick the door. Plaintiff indicated that all he really wanted were his "psych-meds" for his mental problems but that no one would give them to him. ECF No. 8-9 at 17; ECF No. 8-15 at 5.

Plaintiff claimed he injured his back in a fall in his cell on September 1, 2010. When examined on September 2, Plaintiff cursed medical staff and was unable to identify any specific area of back pain. When checked, no area of his back showed any increase in pain or drew any response at all. There was also no source of any head pain or ache. However, medical staff still offered Amato pain medication which he accepted. ECF No. 8-17 at 43-50.

Later that morning, around 9:00 a.m., Plaintiff again banged on his cell door, complaining about his back. Nurse Whitman spoke with Plaintiff and an hour later, called for the Shift Supervisor, Defendant Sergeant Nellie Harris,[18] to report to the Medical Unit because Plaintiff was yelling, cursing, making demands and banging on the cell door. Harris twice warned him to stop and sit down, but Plaintiff refused and cursed Harris. Harris called for assistance, requested the PDU, and ordered Plaintiff onto his knees facing his bunk and to put his hands behind his back. Plaintiff instead threw his property tub against the wall. Harris, who was still outside the cell, opened the cell door to let the assisting officers in. Plaintiff began to kneel as the officers grabbed him, cuffed him from behind, and placed him in leg irons. Plaintiff continued to curse, calling the officers "bitches" and refusing to stand up. He was lifted from the floor, carried from the cell, and placed in the PDU. The restraints were checked and cleared by

---

[18] This incident appears to be the only time Defendant Harris interacted with Plaintiff with regard to placement in restraints.

Nurse Whitman and Medical Technician Crystal Conaway, and Plaintiff was then taken to the gym, where he continued to mock and curse the staff. Plaintiff's behavior and the staff response is confirmed by Detention Center records and Interdisciplinary Progress Notes. ECF No. 8-9, at 16, 18-20; ECF No. 8-17 at 43-50.

At 4:00 p.m., during an assessment, Plaintiff was questioned by medical staff about the medication he ingested on September 1. ECF No. 8-17 at 43-50. Plaintiff admitted that he knew it wasn't his medication but said that he "was going to take whatever the fuck you (medical staff) give me." *Id.*

The next morning, on September 3, 2010, Plaintiff repeatedly threw water from his cell at another inmate who was in a shower shelter, resulting in a major disturbance in the Maximum Security Unit. He became belligerent when questioned by corrections staff and began threatening other inmates who were "running their mouths." At approximately 9:00 a.m., Plaintiff was placed in handcuffs and leg irons, removed from his cell, and escorted to the Male Processing Unit where he was secured in the PDU by Sergeant Fitzgerald, Corporal Schuyler, and Corrections Officers Murphy, Benjamin Wheatley, and Lawayne Cain. He was examined by Nurse Whitman after being secured in the PDU and moved to the Inmate Visiting Area for observation. While being secured in the PDU, Amato said that it "didn't matter," because when he got out, he was going to do it again. He also said, "Fuck y'all" several times and that putting him "on the bed" would just make him stronger. At his first fifteen (15) minute break from the PDU, Plaintiff admitted that he had mixed water, urine, spit and toilet paper to throw at inmate Frank Willey. A short time later, Plaintiff was taken to Admin Seg B where he was secured on the Humane Restraint Bed. His restraints were checked and cleared by Medic Debbie Larrimore. ECF No. 8-9 at 33-39; ECF No. 8-15 at 6-7. The Interdisciplinary Progress Notes for this date

show that even after placement in restraints, Plaintiff remained "extremely aggressive, verbally assaultive and threatening."   ECF No. 8-17 at 50.

On September 4, 2010, at approximately 10:40 a.m., when officers responded to Seg B to remove Plaintiff from the Humane Restraint Bed for his scheduled break, Plaintiff complained he needed pain medication.   Nurse Whitman provided  the medication, but instead of taking it, Plaintiff  complained about mistreatment.   Plaintiff was ordered to take the medication, but became more irritated and shouted, "I swallowed the fucking pills!" When told to drink the water, he threw it at an officer and the nurse.   Plaintiff was placed back on the bed and secured. His restraints were cleared by the medic.   As the officers were leaving, Plaintiff shouted the word "nigger."   ECF No. 8-9 at 40-42.   The Interdisciplinary Progress Notes for this incident support the records provided by Defendants and also demonstrate that the restraints were checked at scheduled intervals.   ECF No. 8-17 at 51-52.

At noon on September 6, 2010, during medical staff inspection, Plaintiff stated he was pulling against his restraints because he was uncomfortable.   Wrist wraps, which Plaintiff agreed were "better," were put in place to prevent any further twisting or rubbing.   ECF No. 9-17 at 52. From September 3 until September 30, 2010, Plaintiff was restrained and confined in Max Seg Cell B and monitored there by Healthcare staff.   ECF No. 8-17 at 88-94.   On September 9, 2010, he banged his head on his cell door.   ECF No. 8-17 at 43.   As his medications took hold, however, Plaintiff's behavior improved and he was released from restraint.   *Id.* at 94.

A behavioral relapse led to another use of restraint.   On October 23, 2010, Plaintiff argued with an African-American detainee, calling him "elephant shit" and leading to a general disturbance.   ECF No. 8-9 at 44-46. Plaintiff was moved to segregation and monitored there by healthcare staff until October 26.   ECF No. 8-17 at 95.

On December 12, 2010, Plaintiff cursed another detainee and a responding officer and caused a general disturbance, resulting in use of the Humane Restraint Bed, where he was monitored every half-hour.  ECF No. 8-9 at 47-54; ECF No. 8-17 at 53.  On December 13, Plaintiff was again cursing and yelling profanities.  He was placed on medical segregation for constant observation due to suicidal ideation.  ECF No. 8-17 at 53-54, 96.  Plaintiff pretended to be unresponsive when correctional staff checked on him and held his breath.  *Id.* at 53-54.  When his straps were moved and the affected areas were rubbed down, Plaintiff "arched up from bed yelling, 'Fuck you bitch, that fucking hurts!'" Plaintiff continued to yell and name-call. He was monitored, reassured, and re-directed to encourage appropriate behavior and was released from medical segregation on December 14, 2010. ECF No. 8-17 at 53-54, 96

On January 5, 2011, Plaintiff threw urine from his cell at another inmate, ECF No. 8-9 at 60-61, and on January 20, 2011, he threatened to kill himself if placed with a cell mate, resulting in his being moved to a Detoxification Cell and restrained in a suicide wrap.  *Id.* at 59; ECF No. 8-17 at 62. This classification ended on February 2, 2011.  *Id.*

Plaintiff  was sentenced in the Circuit Court for Dorchester County on February 17, 2011. ECF No. 8-17 at 59.  Until his transfer to the DOC, Plaintiff was fully medically compliant and his clinical status was deemed "fair."  *Id.* at 59, 61. At the time of his transfer from the Detention Center, Plaintiff was receiving Risperdal[19] (1 mg) and Lithium[20] (300 mg and 900 mg).  *Id.* at 39.

---

[19] Risperdal is used to treat schizophrenia and for maintenance treatment of Bipolar I Disorder.  *See* http://www.risperdalconsta.com/.
[20] Lithium is used to treat and prevent episodes of mania in those with Bipolar Disorder.  *See* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681039.html#why.

**Analysis**

The court must first consider Defendants' affirmative defense that Plaintiff's complaint must be dismissed in its entirety due to his failure to exhaust administrative remedies. The PLRA provides, in pertinent part:

> (a) Applicability of administrative remedies
> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e.

Plaintiff is subject to the strict requirements of the exhaustion provisions, irrespective of whether he was aggrieved by specific occurrences as opposed to general conditions of confinement. *See Porter v. Nussle*, 534 U.S. 516, 528 (2002) (no distinction is made with respect to exhaustion requirement between suits alleging unconstitutional conditions and suits alleging unconstitutional conduct). Exhaustion is also required even though the relief sought is not attainable through resort to the administrative remedy procedure. *See Booth v. Churner*, 532 U.S. 731, 741 (2001). A claim which has not been exhausted may not be considered by this court. *See Jones v. Bock*, 549 U.S. 199, 220 (2007).

Administrative remedies must, however, be available to Plaintiff, and this court is "obligated to ensure that any defects in administrative exhaustion were not procured from the action or inaction of prison officials." *Aguilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007). The Fourth Circuit has addressed the meaning of "available" remedies:

> [A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it. *See id,*. 478 F.3d at 1225; *Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir.2006). Conversely, a prisoner does not exhaust all available remedies simply by failing to follow the required steps so that remedies that once were available to him no longer are. *See Woodford v. Ngo*, 548 U.S. 81, 89 (2006). Rather, to be entitled to bring suit in

federal court, a prisoner must have utilized all available remedies "in accordance with the applicable procedural rules" so that prison officials have been given an opportunity to address the claims administratively. *Id*. at 87. Having done that, a prisoner has exhausted his available remedies, even if prison employees do not respond. *See Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir.2006).

*Moore v. Bennette*, 517 F. 3d 717, 725 (4th Cir. 2008).

Thus, Plaintiff's claims must be dismissed, unless he can show that he has satisfied the administrative exhaustion requirement under the PLRA or that Defendants have forfeited their right to raise non-exhaustion as a defense. *See Chase v. Peay*, 286 F.Supp.2d 523, 528 (D. Md. 2003). The PLRA's exhaustion requirement is designed so that prisoners pursue administrative grievances until they receive a final denial of the claims, appealing through all available stages in the administrative process. *Chase*, 582 F.Supp.2d at 530; *Gibbs v. Bureau of Prisons*, 986 F. Supp. 941, 943-44 (D. Md.1997) (dismissing a federal prisoner's lawsuit for failure to exhaust, where plaintiff did not appeal his administrative claim through all four stages of the BOP's grievance process); *Booth v. Churner*, 532 U.S. 731, 735 (2001) (affirming dismissal of prisoner's claim for failure to exhaust where he "never sought intermediate or full administrative review after prison authority denied relief"); *Thomas v. Woolum*, 337 F.3d 720, 726 (6th Cir. 2003) (noting that a prisoner must appeal administrative rulings "to the highest possible administrative level"); *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002) (prisoner must follow all administrative steps to meet the exhaustion requirement, but need not seek judicial review).

It appears that Plaintiff received an "Inmate Informational Handbook" upon admission to the Detention Center, ECF No. 8-5, and that he frequently filed informal requests and complaints during his seven month stay, none of which related to his placement in restraints. ECF No. 8-11 at 1-52. He claims he filed grievances about various conditions when possible, and alleges that

he often could not obtain the necessary forms because he was housed in high security areas of the Detention Center.  ECF No. 1 at 2; ECF No. 13 at 1-3.  Given this factual dispute, in an abundance of caution, the court will not dismiss this case for failure to exhaust administrative remedies.  Nonetheless, Plaintiff is not entitled to relief with regard to his claim of improper restraint.

Not every inconvenience that is encountered during pretrial detention amounts to "punishment" in the constitutional sense.  *Martin,* 849 F.2d at 870.  A particular restriction or condition of confinement amounts to unconstitutional punishment in violation of the Fourteenth Amendment if it is imposed with the express intent to punish or it is not reasonably related to a legitimate, non-punitive goal.  *Bell*, 441 U.S. at 538– 39 (restrictions or conditions that are arbitrary or purposeless may be considered punishment).  In determining whether the challenged conditions amount to punishment, it is not the province of this court to determine how a particular prison might be more beneficently operated; the expertise of prison officials must be given due deference.[21]  *See Sandin v. Conner*, 515 U.S. 472, 482 (1995).

By his own admission, Plaintiff acknowledged his behavior often was out of control.  Although this factor may have been the result of his Bipolar disorder or other mental disease, this factor does not mean that Detention Center personnel cannot take action to protect staff and the other detainees from the possible consequences of Plaintiff's actions.  The use of restraints was limited in duration, Plaintiff was monitored by both Detention Center and contractual medical

---

[21] Only conditions which "deprive inmates of the minimal civilized measure of life's necessities" may amount to cruel and unusual punishment. *Rhodes v. Chapman*, 452 U. S. 337, 347 (1981).  In order to establish the imposition of cruel and unusual punishment, Plaintiff must prove two elements - that he suffered deprivation of a basic human need that was "*objectively* sufficiently serious," and that "*subjectively* [defendants] acted with a sufficiently culpable state of mind." *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (emphasis in original; citation omitted).  To withstand summary judgment on a challenge to prison conditions, Plaintiff must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions. *See Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993).  Such injury has not been demonstrated here.

personnel,[22] and attempts were undertaken to release Plaintiff from restraint and reintegrate him with other Detention Center detainees once his episodes of rage ended. Nothing more is constitutionally required.

Accordingly, Defendants' dispositive motion shall be granted. Summary judgment will be entered in Defendants' favor by way of separate Order to follow.

Date: March 26, 2014                          _____
                                                              /s/
                                                    ROGER W. TITUS
                                             UNITED STATES DISTRICT JUDGE

---

[22] At most, Plaintiff had chaffed wrists and a sore back for which pain medication was provided.